**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**CLARKSBURG**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>        Plaintiff**,**<br><br>**v.**<br><br>**STEVEN SCOTT NESTOR,**<br><br>        Defendant. | **Case No.: 1:17CR43**<br>**(JUDGE KEELEY)** |

## REPORT AND RECOMMENDATION

### Introduction

On November 13, 2017, Defendant Steven Scott Nestor, by counsel, Katy J, Cimino, Assistant Federal Public Defender, filed a motion to suppress the physical evidence obtained from his vehicle subsequent to his arrest on May 10, 2017. (ECF No. 17). On November 20, 2017, the United States Attorney through Assistant United States Attorney, Traci M. Cook, filed a response to Defendant's motion. (ECF No. 23). On November 14, 2017, the matter was referred to the undersigned United States Magistrate Judge by United States District Judge Irene M. Keeley. (ECF No. 18).

On November 27, 2017, the parties appeared before the undersigned for a hearing on Defendant's Motion to Suppress. On November 29, 2017, Defendant, through his counsel, filed a supplemental memorandum in support of his motion. (ECF No. 26). On November 30, 2017, the United States filed its supplemental memorandum in opposition to Defendant's motion to suppress. (ECF No. 28).

## Statement of Facts

Defendant Steven Scott Nestor was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on August 29, 2017, 2017, charging him with unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. (ECF No. 4). Defendant was subsequently arraigned and detained pending trial.

During the November 27, 2017, suppression hearing, Division of Natural Resource Officer Benjamin Riley testified as follows:

On May 10, 2017, Officer Riley was travelling on Jack Run Road, in Harrison County, West Virginia, near Saltwell Road, in response to "an injured deer" call. En route, Officer Riley observed a truck pulled off on the side of the road and individuals removing from the bed of the truck, items Officer Riley believed to be trash, and placing those items on the side of the road.[1] Officer Riley stopped his vehicle, pulled alongside Nestor's truck, rolled down his window and inquired of Nestor what they were doing. Nestor explained that they were removing items to make space in the truck so that they could salvage scrap metal from an old camping trailer located on the property. Subsequently, Officer Riley noticed the second individual present, on the opposite side of the truck, and who Officer Riley believed was hiding from him. That individual was later determined to be David Martin, Officer Riley's distant cousin.[2]

At 12:31 hours Officer Riley radioed headquarters and informed them of his location and of the alleged illegal dump that he was investigating. (ECF No. 25-4 at 1).

---

[1] On cross-examination, Officer Riley stated that he did not take any video footage or photographs of the items Nestor and Martin were allegedly dumping, but recalled seeing a hay bale, pop cans and other broken down material.

[2] On cross-examination Officer Riley testified that he recognized Martin when he saw him, he had arrested him in the past, and was aware that Martin had a criminal record.

Subsequently, he parked his vehicle in the road, left his hazard lights flashing, exited his vehicle, and continued to question Nestor and Martin. Nestor further explained that they had the land owner's permission to tear down the trailer located on the property. Having some familiarity with the area, Officer Riley indicated he did not recognize the name of the landowner Nestor gave him. Shortly thereafter, a local resident affirmed Officer Riley's suspicions, indicating the landowner's name Nestor identified was not correct. Officer Riley made no attempt to contact the person Nestor identified to verify the veracity of Nestor's statement.

Officer Riley radioed headquarters for an identification and warrant check on Nestor and Martin. (ECF No. 25-4 at 1). Thereafter, headquarters informed Officer Riley that both Martin and Nestor had possible outstanding warrants: an illegal possession of a firearm for Martin and a possible bad check for Nestor. Upon learning about the possible warrants, Officer Riley placed Nestor and Martin in handcuffs for "officer safety" and requested backup to assist with transporting them to jail if the warrants were confirmed.[3] Officer Riley explained that his vehicle could only be used to transport one individual safely, as it was not equipped with a barrier separating the front and back seat. Thereafter, headquarters informed Officer Riley that the outstanding warrant on Martin was actually for Martin's son.

Officer Riley went on to testify that he noticed both new and old items located in both in the bed and inside of Nestor's truck. After inquiring about the items, Nestor informed Officer Riley that he recently purchased those items from Walmart and that the

---

[3] On cross-examination Officer Riley stated that prior to handcuffing Nestor and Martin, they were not free to leave.

receipt was located inside the truck. He also denied Officer Riley permission to search his truck. Officer Riley then radioed headquarters and requested a K-9 unit.

Thereafter, Officer Riley returned to his vehicle to run Nestor's license plate. However, prior to doing so, Nestor advised him that the license plate did not belong on his truck and was registered to his wife's vehicle. Nestor further advised that the vehicle was neither registered nor insured. Headquarters confirmed that the plate did not belong to Nestor's truck and advised that Nestor had a revoked driver's license. Officer Riley emphasized that he had decided to arrest Nestor for the open dump after considering Nestor drove without a valid driver's license, had driven an unregistered and uninsured vehicle, and had lied to him.[4]

Harrison County Sherriff Deputy ("HCSD") Deem arrived at the scene at 12:50 hours (ECF No. 25-1 at 2). HCSD Laulis, arrived with the K-9 at 12:58 hours. The K-9 positively alerted for the presence of drugs at the at the passenger's side door of Nestor's truck. Subsequently the truck was searched and the items Nestor now seeks to suppress were discovered. Following the search, Officer Riley requested headquarters to call a tow truck.

Officer Riley further testified that headquarters had still not provided to him any information regarding Nestor's warrant, but that the warrant issue was abandoned, and that he was arresting Nestor for the illegal open dump. Nestor was ultimately charged with unlawful disposal of litter, which was later dismissed.

---

[4] On Cross-Examination Officer Riley stated that he believed Nester attempted to put the items back in the truck but when the truck was towed there were some items still in the truck and on the ground.

## Contention of the Parties

Defendant contends:

    1. The encounter between Defendant Nestor and Officer Riley was an investigatory stop, not a consensual encounter, and there was no reasonable articuable suspicion to conduct such a stop.

    2. Officer Riley did not have probable cause to arrest Defendant Nestor for an open dump.

The United States contends:

    1. The initial contact between Officer Riley and Defendant Nestor was a consensual police-citizen encounter where the officer found Defendant Nestor on the side of the road, outside of his vehicle, and the office did not display any force or show of authority.

    2. Even if a seizure occurred during the initial encounter between the officer and Defendant Nestor, the initial encounter was lawful under *Terry* because Officer Riley had a reasonable articulable suspicion that Defendant Nestor was creating an illegal open dump.

    3. The canine sniff of the exterior of Nestor's truck did not violate the Fourth Amendment because the canine sniff was performed at a time the truck was in a public place and the vehicle could not leave the scene without being towed.

## Discussion

The Fourth Amendment protects individuals from unreasonable searches and seizures from the Government. U.S. Const. amend. IV. However, the Fourth Amendment is not implicated in every circumstance. For example, "law enforcement

officers do not violate the Fourth Amendment's prohibition of unreasonable seizures" by approaching another person in a public space and speaking with or asking the person questions. United States v. Drayton, 536 U.S. 194, 200 (2002). However, the Fourth Amendment is implicated when a person is seized. INS v. Delgado, 466 U.S. 210, 215 (1984); United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998). A police-citizen encounter may become a seizure "when, in view of the totality of the circumstances surrounding the 'stop,' a reasonable person would not feel free to leave or otherwise terminate the encounter." United States v. Weaver, 282 F.3d 302, 309-10 (4th Cir.) cert denied, 537 U.S. 847 (2002).

### A. The encounter between Nestor and Officer Riley was an investigatory stop that was supported by reasonable suspicion.

Courts consider several factors when applying the totality of the circumstances test surrounding a stop, including "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statements to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer, and the physical touching by the police of the citizen. Id. (citation omitted).

During the hearing, Officer Riley testified that shortly after he stopped to inquire of Nestor and Martin what they were doing and prior to placing them in handcuffs, he was investigating the matter, and concluded that because he saw Nestor and Martin taking items from the bed of the truck and placing them on the ground, he believed that they were creating an illegal dump and as such, believed illegal activity was taking place. He further stated that he was suspicious of the men and ordered them to show their hands while he contacted headquarters and investigated into the matter. While he

6

did not testify about his own demeanor or tone of voice, he adamantly stated on the record that Nestor and Martin were not free to leave shortly after he arrived and that he would have given chase had either of them try to leave. The Court is of the opinion Officer Riley conveyed to the men that they were not free to leave and a reasonable person under the same or similar circumstances would feel the same. Consequently the Court concludes that the encounter between the parties was an investigatory stop.

Consequently, the question now before the Court with respect to the search and seizure of the physical evidence obtained from Defendant Nestor's vehicle is whether Officer Riley had reasonable articulable suspicion to stop and briefly detain Defendant Nestor for investigative purposes. The Court finds that he did.

Fourth Amendment protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 273 (2002). If the officer's actions are supported by reasonable suspicion based on articulable facts that criminal activity is taking place, the Fourth Amendment is satisfied. Illinois v. Wardlow, 528 U.S. 119, 123 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). However, an officer's reliance on "an unparticularized suspicion or hunch" is insufficient. Terry, 392 U.S. at 27.

Determining whether there is reasonable suspicion depends on the totality of the circumstances to see if the detaining officer has a "particularized and objective basis for suspected legal wrongdoing." Arvizu, 534 U.S. at 273; United States v. Cortez, 449 U.S. 411, 417 (1981). This includes the information known to the officer and any reasonable inferences to be drawn at the time of the stop. Arvizu, 534 U.S. at 273.

During the hearing, Officer Riley stated he believed Nestor and Martin were creating an illegal dump after observing them putting items they had removed from Nestor's truck onto the ground. He supported his position, explaining what he saw was inconsistent with a legal open dump, which requires solid waste to be buried and irrigated. See W.Va. Code Section 22-15-10(a). Officer Riley further explained that "dumping" was a known issue along Jack Run Road, highlighting that he received yearly complaints from one woman that lived in the area. He further stated that he believed Martin's behavior was suspicious, and while he failed to obtain any photos of the alleged "trash" or "junk", he identified seeing Nestor and Martin remove from Nestor's truck, a "hay bale," "pop cans" and "other broken down material." Considering the facts mentioned, the Court finds that Officer Riley had a particularized and objective basis for suspecting Nestor and Martin were creating an illegal dump in violation of W.Va. Code, Section 22-15-10.

**B. Officer Riley did not have probable cause to arrest Nestor.**

An officer is permitted to arrest an individual who commits a misdemeanor or other minor offense in the presence of the officer. See Virginia v. Moore, 553 U.S. 164, 176078 (2008) (finding that arresting a motorist for driving on a suspended license did not violate the Fourth Amendment); Atwater v. Lago Vista, 532 U.S. 318, 354 (2001) (stating, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Warrantless misdemeanor arrests 'made under authority of a statute must conform strictly to its provisions; otherwise they will not be

valid, and the one arresting becomes a trespasser'". Virginia, 553 U.S. at 179 (2008) (citation omitted).

Here, Officer Riley has repeatedly stated that he believed Nestor and Martin had created an illegal dump because he saw them removing items from the bed of Nestor's truck and putting those items on the ground. An open dump is "where solid waste is disposed in a manner that does not protect the environment. W.Va. Code, Section 22-15-2. The question is whether Nestor and Martin were disposing the items that Officer Riley allegedly saw. Removing items and placing them on the ground, in itself, is not equivalent to disposing the items. Nestor and Martin indicated that they were creating room in the bed of the truck to scrap metal. Officer Riley failed to clarify whether Nestor and Martin were removing the items permanently or temporarily. Furthermore, he admitted that in his presence Nestor took some of the items that had previously been removed from the truck and put them back, and while Officer Riley noted items remained on the side of the road after Nestor and Martin were placed into custody, it would be unreasonable to believe that the men could continue to return items to the truck while in handcuffs.

The Court concludes that no crime was committed in Officer Riley's presence, and that the officer erred when he concluded that an illegal dump had occurred because this crime requires the offender to dispose of the items. Nestor and Martin removed the items from their truck, but did not get so far as disposing of them. At the points where the officer chose to investigate and subsequently arrest, the most that he could conclude was that it was possible that a crime was *about* to be committed. Whether it was the Defendants original intent to put the items back or their intent was altered by

9

the officer's presence, we cannot know. Either way, probable cause is only valid for crimes committed, not crimes considered.

### C. The duration of the stop was reasonable

"While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers." United States v. Hill, 82 F.3d 377, 382 (4th Cir. 2017) (citation omitted). If the unrelated activity does not prolong the roadside detention for the traffic infraction, that activity is permitted under the Fourth Amendment. Id. In general, officers must focus their attention on the initial basis for the stop, but is permitted to engage in certain safety measures during the stop, including "inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." Id. (citing Rodriguez v. United States, 135 S.Ct. 1609, 1615 (2015)). Moreover, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission to address the traffic violation that warranted the stop, and attend to related safety concerns." Rodriguez, 135 S. Ct. at 1615.

Here, within minutes of stopping Nestor, Officer Riley contacted headquarters for an identification and warrant check. Within minutes of his inquiry, headquarters informed Officer Riley that Nestor had a possible outstanding warrant. Officer Riley continued to detain Nestor until he received verification of that warrant. He was still waiting for that verification when the dog sniff occurred. The Court finds that Officer Riley was attending to related safety concerns by verifying the warrant and that Nestor's detention was not prolonged by waiting for the warrant verification.

10

### D. Because the initial stop and duration of the stop was reasonable, the drug sniffing dog was permitted.

The use of a trained drug sniffing dog is an accepted investigative technique used in various jurisdictions, including the Fourth Circuit. See Illinois v. Caballes, 543 U.S. 405, 409-410; United States v. Palmer, 820 F.3d 640, 650 (4th Cir. 2016); United States v. Mason, 628 F.3d 123, 130 (4th Cir. 2010). When a trained drug dog "alerts," to an item, such action establishes probable cause to search a vehicle or other property to which the dog was alerted. Palmer, 820 F.3d at 650. Whether or not a crime has been committed, if the initial stop is deemed proper and the duration of the stop is reasonable, drug sniffing dogs are permitted. Caballes, 543 U.S. at 406-08.

In Caballes, the defendant was stopped for speeding, and while the officer was writing him a ticket—without reasonable, articulable suspicion of drug activity—a trained drug dog was allowed to sniff the vehicle. After the dog alerted, the defendant's vehicle was searched and contraband was discovered. The Court noted that both the initial stop and its duration (less than 10 minutes) were proper.

Here, as previously discussed, the Court finds that Officer Riley had reasonable suspicion to investigate an alleged illegal dump, deeming the initial stop proper, and finds that the duration of the stop was not prolonged, as a result of waiting for the trained dog, as Officer Riley was also still waiting to receive verification from headquarters regarding Nestor's outstanding warrant.

Assuming arguendo, that waiting for the dog sniff prolonged the roadside detention, the Court finds a dog sniff of the truck was still permissible, as the vehicle was located on public property and could not be driven away as a result of the invalid registration.

In conclusion, although the court disagrees with the officers assessment of probable cause to arrest for illegal dump, his initial stop to investigate was not improper and overlapping circumstances of the stop meant that the duration was not unreasonable. Therefore, the dog sniff was legal and permissible. As such, the physical evidence obtained from Nestor's truck was obtained lawfully and should not be suppressed.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned finds the physical evidence obtained from Nestor's truck was lawfully seized. Therefore, the undersigned recommends Defendant's Motion to Suppress Physical Evidence (ECF No. 17) be **DENIED.**

Any party may file with the Clerk of the Court, written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. Objections must be filed on or before **December 8, 2017**. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. §636(b)(1). United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to forward a copy of the this Report and Recommendation to counsel of record.

Respectfully submitted this 6th day of December 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE