**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v. // CRIMINAL NO. 1:17CR43**
**(Judge Keeley)**

**STEVEN SCOTT NESTOR,**

**Defendant.**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

This case arises out of a dog sniff conducted by West Virginia law enforcement officers during their roadside investigation of the defendant, Steven Scott Nestor ("Nestor"), who is a convicted felon. When the dog sniff of Nestor's unregistered truck resulted in a positive alert, the officers searched his vehicle and uncovered a variety of contraband, including a firearm. Pending is Nestor's motion to suppress that evidence, which he claims was obtained in violation of his Fourth Amendment rights. For the following reasons, the Court **DENIES** the motion (Dkt. No. 17).

## I. BACKGROUND

### A. Procedural History

On August 29, 2017, the grand jury returned a one-count indictment against Nestor, charging him with unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Dkt. No. 4). The Court issued a warrant for Nestor's arrest, which

USA V. NESTOR 1:17CR43

MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]

was executed on October 23, 2017 (Dkt. Nos. 6; 15). That day, Nestor made his initial appearance before the Honorable Michael J. Aloi, United States Magistrate Judge, pleaded not guilty, and was remanded to the custody of the United States Marshals Service (Dkt. Nos. 11; 12).

On November 13, 2017, Nestor moved to suppress the methamphetamine, heroin, scales, needles, money scanner, and firearm discovered during the search of his vehicle (Dkt. No. 17). Nestor argued that the officers discovered this evidence as the result of an investigatory stop unsupported by reasonable suspicion, which also was unreasonably extended to accomplish the dog sniff. Id. at 6-10. In its response to the motion, the Government contended that the encounter was consensual, any investigatory detention was justified by reasonable suspicion, and the stop was not prolonged for the purpose of effectuating the dog sniff (Dkt. No. 23).

**B. Suppression Hearing**

On November 27, 2017, Magistrate Judge Aloi conducted a hearing on Nestor's motion to suppress (Dkt. No. 24). The Government presented testimony from the arresting officer, West Virginia Division of Natural Resources ("DNR") Officer Benjamin

2

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

Riley ("Officer Riley"). Nestor's attorney vigorously cross-examined Officer Riley, but Nestor did not present any contrary testimony. Indeed, although Nestor referred to Officer Riley's written report in briefing (Dkt. No. 41 at 1), the only evidence before the Court is Officer Riley's testimony and associated exhibits.

The Court has reviewed the audio recording of the suppression hearing, the transcript of the proceeding (Dkt. No. 29), and the following joint exhibits: 1) Harrison/Taylor County 911 dated for 5/10/2017; 2) CAD Operation Report dated for 5/10/2017; 3) C/D of radio communication on 5/10/2017; and 4) Transcript of Radio Traffic from 5/10/2017 (Dkt. No. 25). Magistrate Judge Aloi utilized Officer Riley's testimony to establish the factual basis for his R&R, implicitly indicating he found the testimony credible. Nestor does not challenge the veracity of Officer Riley's testimony or its use in the R&R, and the parties do not appear to seriously dispute the facts of this case.

On May 10, 2017, Officer Riley was on duty in Harrison County, West Virginia. He was in uniform, carrying a badge, armed with a gun, and driving a DNR pickup truck, clearly marked and equipped with lights and sirens (Dkt. No. 29 at 8, 28-29). During the course

3

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

of his shift, he drove down Jack Run Road to respond to an injured deer call. Id. at 5-7. Before he reached the injured deer on Saltwell Road, however, Officer Riley confronted the circumstances that precipitated Nestor's pending charge. Id. at 7.

Officer Riley noticed a truck parked off the left side of the road on private, posted property, and observed Nestor as he removed items from the bed of the truck and placed them on the ground. Id. at 8, 11. He described these items generally as "trash" and "junk," including bottles, cans, tires, an old hay bale, "other material, cabinet, [and] papers." Id. at 36-37.[1] Officer Riley stopped his truck, rolled down his driver's side window, and asked Nestor what he was doing. Nestor advised that he was making room to haul away portions of a dilapidated trailer located nearby, which was visible from Officer Riley's vehicle. Id. at 9.

At that time, Officer Riley observed another individual hiding from view on the opposite side of Nestor's truck. This made Officer Riley suspicious, so he "called that individual out and told him to show . . . his hands." Id. When the other individual stepped out, Officer Riley immediately recognized David Wayne Martin ("Martin"),

[1] Officer Riley did not take pictures of these items, preserve them as evidence, or specifically list them in his report (Dkt. No. 29 at 36-37).

4

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

a distant cousin of Officer Riley's whom he actually had arrested in the past. Id. at 27-28.

Suspicious of both Nestor's explanation and Martin's attempt to hide from him, Officer Riley decided to investigate further. He pulled into the lane of travel closest to Nestor's truck, approximately a "[c]ar width and a half" away, turned on his flashers, and exited his DNR vehicle. Id. at 10-11, 28-29. He continued to question the pair concerning why Martin had been hiding and why they were removing items from the truck. Id. at 13. The two continued to explain that they had permission from the landowner to tear down the nearby trailer. Although Officer Riley was familiar with the area due to prior poaching complaints, he did not recognize the landowner name that they provided. Id. at 13-14.

When an individual who lived nearby happened to approach, Officer Riley attempted to confirm the landowner's name provided by Nestor and Martin. The individual advised Officer Riley that it was not the true landowner's name, and that Nestor's vehicle should not be on the property. Id. at 14. In fact, it later came to light that Nestor and Martin had been removing the items so that they could "finish a tree job" in nearby Bridgeport, an explanation Officer

5

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

Riley believed because he knew that Martin "cuts trees a lot." Id. at 36.

After this, Officer Riley decided "to run their names," and directed Nestor and Martin to stand in particular locations with their hands out of their pockets while he returned to use the radio in his truck. Id. at 14-15. At 12:31 P.M., Officer Riley radioed dispatch to advise that he was on Jack Run Road investigating an "illegal dump," and asked dispatch to check whether either Nestor or Martin was the subject of any outstanding warrants (Dkt. No. 25-4 at 1).[2] The pair were able to hear Officer Riley communicating with dispatch (Dkt. No. 29 at 31).

Shortly after receiving the inquiry, Officer Riley headquarters called to advise that there was a possible warrant on Martin for illegally possessing a firearm, as well as a possible warrant on Nestor for writing a bad check. Upon learning that the pair were possibly subject to outstanding warrants, Officer Riley placed them in handcuffs for his own safety, and requested backup for the purpose of transporting them (Dkt. Nos. 29 at 15-16; 25-4

[2] It is unclear from the record whether this is the first time Officer Riley contacted dispatch. Although he testified to have radioed headquarters before exiting his truck (Dkt. No. 29 at 12), the transcript of radio traffic provided by the parties begins with this 12:31 P.M. communication (Dkt. No. 25-4 at 1).

6

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

at 1-3). Headquarters dispatched Harrison County Sheriff's Department Deputy Brian Deem ("Deputy Deem") at 12:37 P.M. Thereafter, it advised Officer Riley that the warrant initially thought to be outstanding on Martin was actually for his son (Dkt. No. 25-4 at 3).

Before he received further confirmation regarding Nestor's possible warrant, Officer Riley questioned Nestor and Martin about several new items in the back of their truck, including gloves, sunglasses, and a cooler (Dkt. No. 29 at 21, 60). Nestor replied that they had just purchased the items at Wal-Mart, and that he had a receipt in the vehicle. Officer Riley asked whether there were any drugs or guns in the vehicle, and requested permission to search it. When Nestor refused to provide consent, Officer Riley requested a canine unit.[3]

At that time, headquarters advised that Deputy Deem was still on his way and wanted to speak with Nestor and Martin. It also provided the following with regard to Nestor's warrant: "I'm not able to confirm if it's the same individual or not. It's a

---

[3] Officer Riley's testimony on this sequence of events is inconsistent, but not to the extent that it undermines his credibility. On cross-examination, Officer Riley insisted that he had requested a canine unit prior to asking Nestor whether he could search the vehicle (Dkt. No. 29 at 63).

7

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

worthless check warrant from 2009" (Dkt. Nos. 29 at 21; 25-4 at 5). At 12:41 P.M., headquarters dispatched Harrison County Sheriff's Deputy John Laulis ("Deputy Laulis"), the canine unit officer (Dkt. No. 25-4 at 5).

Officer Riley proceeded to obtain the license plate number on Nestor's truck, at which time Nestor candidly admitted that the license plate actually was associated with another car he owned. Nestor further advised that the truck itself was not registered or insured, and Officer Riley quickly discovered that neither man had a valid driver's license (Dkt. No. 29 at 17). After confirming this information with dispatch (Dkt. No. 25-4 at 6), Officer Riley decided to arrest Nestor and Martin for the misdemeanor offense of creating an open dump.[4]

Although Officer Riley typically does not arrest individuals for illegal dumping, preferring to give them "an opportunity to correct their actions," the totality of the circumstances caused him to adopt a different course with Nestor and Martin. He felt

[4] Officer Riley did not file charges for creating an open dump because Nestor and Martin were cooperating with the Harrison County Drug Task Force, and he wanted to speak with the prosecutor concerning whether felony drug charges would be filed. He explained that "we typically don't charge misdemeanors along with felony drug charges" (Dtk. No. 29 at 26).

8

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

that the circumstances had been aggravated by untruthfulness, the legal status of the truck, and the fact that neither was a licensed driver. Id. at 18-19, 39. According to Officer Riley, his decision to arrest the pair for illegal dumping is reflected by his request, made prior to Deputy Deem's arrival, that headquarters "start a CAD for [him]" (Dkt. Nos. 25-4 at 7; 29 at 19, 52-53).

Deputy Deem arrived on the scene at 12:50 P.M., at which time the officers permitted Nestor and Martin to smoke a cigarette. From that point on, everyone awaited the arrival of the canine unit so that Officer Riley could continue his investigation into the vehicle's contents, which he believed included drugs (Dkt. Nos. 25-4 at 7; 29 at 64). Deputy Laulis arrived at 12:58 P.M. and, after being filled in on the situation, conducted a dog sniff around the truck (Dkt. Nos. 25-1 at 2; 25-4 at 7; 29 at 23-24, 59). After the dog made a positive alert, a search of the vehicle resulted in the seizure of methamphetamine, heroin, scales, needles, a money scanner, and the firearm at issue in this case, a Diamondback pistol, model DB9, 9mm caliber (Dkt. No. 29 at 24-25).

Ultimately, Officer Riley asked dispatch to send a tow truck to transport Nestor's unregistered vehicle, which could not be driven from the scene. Id. at 21, 25. Although there were

9

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

circumstances under which Officer Riley could have allowed Nestor to arrange for his own transportation of the truck, id. at 40, he testified that, with the exception of minor vehicle accidents, he does not permit people to do so. Moreover, he has never "left an illegal vehicle off the side of the road that's unregistered, uninsured and just allowed somebody to call for a tow whenever it is that they want to." Id. at 56-57.

**C. Report and Recommendation**

On December 6, 2017, Magistrate Judge Aloi entered an R&R, recommending that the Court deny Nestor's motion to suppress (Dkt. No. 38). He concluded that, although the initial encounter between Officer Riley and Nestor was not consensual, Officer Riley's investigatory stop was justified by a reasonable suspicion that Nestor was creating an open dump. Id. at 6-8.

The R&R further reasoned that Nestor's arrest was not supported by probable cause, but that the dog sniff nonetheless took place during the permissible scope of the investigatory stop while Officer Riley was waiting to receive verification regarding Nestor's possible outstanding warrant. Id. at 10-11. Thus, because the investigatory stop was not unreasonably extended to permit the dog sniff, Magistrate Judge Aloi concluded that Nestor's truck was

10

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

not searched in violation of his Fourth Amendment rights; he therefore recommended that Nestor's motion be denied. Id. at 11-12.

**D. Nestor's Objections**

Nestor's timely objections, filed on December 8, 2017, raised three specific objections to the R&R (Dkt. No. 41). More particularly, Nestor renews his arguments that there was no reasonable, articulable suspicion for Officer Riley to conduct an investigatory stop, the duration of the stop was unreasonable, and the dog sniff was therefore impermissible. Id. at 4-9.

## II. STANDARD OF REVIEW

When considering a magistrate judge's R&R made pursuant to 28 U.S.C. § 636(b)(1)(C), the Court must review de novo those portions to which objection is timely made. Otherwise, "the Court may adopt, without explanation, any of the magistrate judge's recommendations to which the prisoner does not object." Dellacirprete v. Gutierrez, 479 F. Supp. 2d 600, 603-04 (N.D.W.Va. 2007) (citing Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983)). Courts will uphold those portions of a recommendation to which no objection has been made unless they are "clearly erroneous." See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

11

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

## III. APPLICABLE LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects . . . against unreasonable . . . searches and seizures." U.S. Const. amend. IV. "The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Sims v. Labowitz, 877 F.3d 171, 177 (4th Cir. 2017) (quoting Schmerber v. California, 384 U.S. 757, 767 (1966)).

As the Supreme Court has stated time and again, "[r]easonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Cty. of Los Angeles, Calif. v. Mendez, 137 S. Ct. 1539, 1546 (2017) (internal quotation and citation omitted).

## IV. DISCUSSION

Following de novo review of the record and the parties' arguments, the Court concludes that Officer Riley's conduct complied with the Fourth Amendment. Although his encounter with Nestor was non-consensual, the investigative detention was

12

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

supported by reasonable suspicion and remained reasonable in scope through the time that Officer Riley decided to arrest Nestor for creating an open dump. Moreover, the arrest was supported by probable cause, and the subsequent dog sniff of Nestor's truck was permissible under the Fourth Amendment. Therefore, for the following reasons, the Court **DENIES** Nestor's motion to suppress (Dkt. No. 17).

**A. The interaction between Officer Riley and Nestor was not a consensual police-citizen encounter.**

Neither party objected to Magistrate Judge Aloi's conclusion that the encounter at issue was an investigatory stop rather than consensual (Dkt. No. 38 at 6). The Court agrees that the totality of the circumstances in this case indicate that a reasonable person in Nestor's position would not have felt free to leave. See United States v. Jones, 678 F.3d 293, 299 (4th Cir. 2012).

As a general matter, police officers are free to approach and question individuals without necessarily effecting a seizure. Rather, a person is seized within the meaning of the Fourth Amendment "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Id. (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). Such a seizure can be said to occur when, after considering the

13

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

totality of the circumstances, the Court concludes that "a reasonable person would have believed that he was not free to leave." Id. (quoting United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989)). Similarly, when police approach a person at a location that they do not necessarily wish to leave, the appropriate question is whether that person would feel free to "terminate the encounter." See Florida v. Bostick, 501 U.S. 429, 436 (1991). "[T]he free-to-leave standard is an objective test, not a subjective one." United States v. Analla, 975 F.2d 119, 124 (4th Cir. 1992).[5]

When "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)). The following non-exhaustive list of factors guides whether officers have made a sufficient "show of authority":

> [T]he number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant,

[5] For this reason, it is irrelevant that Officer Riley testified that Nestor would not have been free to leave, even prior to being placed in handcuffs (Dkt. No. 29 at 32).

14

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

> whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature."

Jones, 678 F.3d at 300 (quoting Gray, 883 F.2d at 322-23).

In this case, Officer Riley approached Nestor for questioning while wearing a uniform, carrying a gun, and driving a clearly marked law enforcement vehicle. His questioning began with routine topics such as the subjects' identities, and he requested Nestor's identification without informing him that he was free to leave. Standing alone, these usual indicia of authority would not render the encounter non-consensual. Id.; Analla, 975 F.2d at 124. When such routine activities are measured against other aspects of the encounter, however, the totality of the circumstances would clearly have conveyed to Nestor - or any reasonable person - that he was being "targeted" for investigation, and thus was not free to leave. Jones, 678 F.3d at 301.

First, there is no evidence that Officer Riley asked permission to speak with Nestor or explained that he simply was on a routine patrol of the area. The Fourth Circuit has reasoned that these are "the routine practice[s] of officers seeking to engage in

15

USA V. NESTOR 1:17CR43

MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]

a consensual encounter when they approach an individual," id. at 303, and their absence suggests a non-consensual encounter.

Second, a hallmark of non-consensual encounters with law enforcement officers is the expectation that they will "exercise unquestioned command of the situation" for the safety of all participants. Brendlin v. California, 551 U.S. 249, 258 (2007). This "unquestioned command" is inconsistent with an individual's freedom "to leave or terminate the personal encounter . . without advance permission." Id. When he arrived on the scene, Officer Riley not only directed routine questions at Nestor, but almost immediately began issuing directives to ensure "officer safety" by directing Martin to come out and show his hands. Furthermore, while he ran their names, Officer Riley directed Nestor and Martin to stand in particular locations. Cf. Jones, 678 F.3d at 303 ("[W]e conclude that a reasonable person would not have felt free to walk away and ignore [the] nearly immediate 'requests' that the person first lift his shirt and then submit to a pat down search."). The pair submitted to these assertions of authority by complying with Officer Riley's commands, and even attempted to place some of the items back into Nestor's truck (Dkt. No. 29 at 38).

16

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

Third, the position of an officer's vehicle can convey to a suspect that he is not free to leave. In Jones, officers "pulled in behind" the defendant's vehicle "on a public roadway, and follow[ed] it onto private property." 678 F.3d at 300. When the defendant stopped, the officers "pulled the police cruiser to a stop in the lane of traffic and parked there, effectively blocking [the defendant] from moving his vehicle." According to the Fourth Circuit, the officers' behavior eliminated one of the "traditional hallmark[s] of a police-citizen consensual encounter" by approaching in a manner that was far from routine. Id.

Here, Officer Riley parked his DNR truck in the lane of travel closest to Nestor's vehicle, situating it side-by-side just a "car width and a half" away, and turned on his flashers. Simply put, this is not routine behavior, as there is no indication that Officer Riley was incapable of parking his vehicle out of the road. Moreover, due to Officer Riley's position, Nestor only would have been able to break off the encounter and leave by driving directly past the hastily parked DNR truck. It seems unlikely that a reasonable person would find it prudent to do so, especially in light of Officer Riley's already authoritative commands that Nestor and Martin keep their hands in view.

17

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

In summary, from the outset of his interaction with Nestor, Officer Riley accompanied his usual indicia of authority with other clear signals that the encounter was not routine. He immediately questioned Nestor, issued commands to the suspects, and positioned his vehicle in the middle of the road. Given the totality of these circumstances, the Court concludes that a reasonable person in Nestor's position would not have felt free to break off the encounter with Officer Riley or leave the scene.[6]

**B. Officer Riley's investigatory stop was justified at its inception and remained reasonable in scope.**

Given that Nestor was seized pursuant to a non-consensual investigatory detention, the Fourth Amendment requires that the seizure be reasonable. United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). Analyzing the reasonableness of an investigatory detention proceeds under the two-prong test articulated in Terry v. Ohio, 392 U.S. 1 (1968). First, the officer's action must be "justified at its inception." United States v. Vaughn, 700 F.3d 705, 709 (4th Cir. 2012) (quoting United States v. Rusher, 966 F.2d

[6] In addition, as the Government concedes, Nestor was undoubtedly detained when Officer Riley placed him in handcuffs (Dkt. No. 28 at 9). The Court's analysis proceeds, however, from the premise that the investigatory detention at issue began within moments after Officer Riley first arrived on the scene.

18

USA V. NESTOR 1:17CR43

MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]

868, 875 (4th Cir. 1992)). Second, "the officers' actions during the [detention] must be 'reasonably related in scope' to the basis for the [detention]." United States v. Hill, 852 F.3d 377, 381 (4th Cir. 2017) (quoting Williams, 808 F.3d at 245).

Magistrate Judge Aloi concluded that Nestor's detention was justified by a reasonable, articulable suspicion that he was creating an open dump (Dkt. No. 38 at 7-8). The R&R further concluded that the stop was reasonable in scope. Id. at 11. Nestor objects that Officer Riley had no reason to detain him based on the mere fact that he was "taking items out of a truck and placing them on the ground," and that the stop lasted too long (Dkt. No. 41 at 4-6). After careful consideration, the Court concludes that both prongs of the Terry v. Ohio analysis are satisfied in this case, and that Nestor's associated objections are without merit.

**1. Officer Riley had a reasonable, articulable suspicion that criminal activity was afoot.**

As to the first prong, in order to execute an investigatory detention, an officer must have "a reasonable, articulable suspicion that criminal activity is afoot." Williams, 808 F.3d at 245 (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). "Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement

19

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

officers, 'not legal technicians," and "require[s] the detaining officer 'to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." The possibility that some of the facts might be innocently explained does not suffice to defeat a finding of reasonable suspicion if "the relevant facts . . . in their totality serve to eliminate a substantial portion of innocent travelers." Id. at 246 (internal citation and quotation omitted).

In Williams, an officer stopped the defendant for speeding, but extended the traffic stop for the purpose of conducting a dog sniff, which led to the discovery of crack cocaine. Id. at 241. To justify the further detention, and to establish reasonable suspicion that a drug-related crime was underway, the Government relied on the fact that the defendant was driving a rental car, was traveling through "a known drug corridor at 12:37 a.m.," stated travel plans inconsistent with the return date for his rental car, and could not provide a permanent address in New York even though he claimed to live there. Id. at 247.

20

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

The Fourth Circuit found that, standing alone, each of these factors was insufficient, reasoning that they were no more indicative of "nefarious" activity than the normal characteristics of an "innocent traveler." Id. at 247-51. It also found that, even when considered "in the aggregate," the factors "fail[ed] to eliminate a substantial portion of innocent travelers." Id. at 252. It therefore concluded that no reasonable, articulable suspicion existed for the officers to extend the traffic stop and conduct a dog sniff. Id. at 253.

According to West Virginia law, an "open dump" is "any solid waste disposal which does not have a permit under this article, or is in violation of state law, or where solid waste is disposed in a manner that does not protect the environment." W. Va. Code § 22-15-2(23) (2017). "Open dumps are prohibited and it is unlawful for any person to create, contribute to or operate an open dump or for any landowner to allow an open dump to exist on the landowner's property unless that open dump is under a compliance schedule approved by the director." Id. § 22-15-10(a). Anyone who willfully violates this provision "is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than [$2,500] nor more than [$25,000] per day of violation, or imprisoned in a county or

21

**USA V. NESTOR 1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

regional jail not more than one year, or both fined and imprisoned." Id. § 22-15-15(b)(3). Natural resource police officers such as Officer Riley may arrest persons whom they observe violating the criminal law. Id. § 20-7-4(b)(1).

Here, Nestor argues that Officer Riley "had little to go on," and that "taking items out of a truck and placing them on the ground . . . is not indicative of criminal activity on a rural road in West Virginia" (Dkt. No. 41 at 5). Officer Riley, however, was presented with more than enough evidence to support a reasonable, articulable suspicion that Nestor and Martin were engaged in the criminal activity of creating an open dump. While responding to another call, Officer Riley observed two individuals taking "trash" or "junk" - including bottles, cans, tires, and a hay bale - out of a truck and placing them on the side of the road. According to Officer Riley's testimony, this activity was wholly inconsistent with what might have been a lawful dump properly permitted by the Department of Environmental Protection (Dkt. No. 29 at 12, 48-49). Officer Riley also had a history of dealing with illegal dumping on Jack Run Road. Id. at 33-34. By all appearances, Nestor and Martin were creating an open dump by disposing of solid waste without a permit. See W. Va. Code § 22-15-2(23) (2017).

22

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

This case is readily distinguishable from those in which the Fourth Circuit has found a lack of reasonable suspicion. Unlike Williams, where officers were confronted with the seemingly innocuous operation of a rental car on an interstate highway, Officer Riley observed Nestor doing something that appeared downright illegal, unloading "trash" and "junk" from a truck on the side of the road and placing it on private property. That some of the items may have "ha[d] value" and could have been "recycled for a profit," as Nestor suggests (Dkt. No. 41 at 5), does not mitigate the seemingly criminal nature of their disposal. It simply is common sense for an officer to suspect that individuals engaged in such activity are illegally dumping solid waste. See Hill, 852 F.3d at 246. Therefore, the detention was supported by reasonable, articulable suspicion.

**2. The scope of the investigatory detention was reasonable through the time that Nestor was lawfully arrested.**

Under the second prong, a detention supported by reasonable suspicion may yet "violate the Fourth Amendment if its manner of execution unreasonably infringes" the suspect's rights. Illinois v. Caballes, 543 U.S. 405, 407 (2005). The Court must analyze whether Officer Riley's actions were "reasonably related in scope" to the basis for the detention. Hill, 852 F.3d at 381. In addition, the

23

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

permissible duration of an investigatory detention extends only so far as "when tasks tied to the traffic infraction are - or reasonably should have been - completed." Id. (quoting United States v. Rodriguez, 135 S. Ct. 1609, 1614 (2015)).

The acceptable length of a detention thus depends on what an officer actually does, and whether those actions were reasonable under the totality of the circumstances. Id. As the Fourth Circuit has explained:

> An officer may engage in certain safety measures during a traffic stop, but generally must focus his attention on the initial basis for the stop. An officer may engage in "ordinary inquiries incident to" the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants.

Id. at 382 (internal citation omitted).

Here, Nestor argues generally that it took dispatch too long to verify whether Nestor was subject to an outstanding warrant (Dkt. Nos. 17 at 8; 41 at 6-8).[7] When viewed in concert with the totality of the circumstances, however, the check into Nestor's

[7] He also contends that Officer Riley extended the stop "indefinitely" when he continued to investigate after Nestor had provided a lawful explanation for his activities (Dkt. Nos. 26 at 4; 41 at 8). Nestor, however, has provided no authority for the assertion that a suspect's explanation immediately dispels reasonable suspicion.

24

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

possible outstanding warrant plainly continued alongside the diligent pursuit of other permissible inquiries.

As discussed in more detail below, Officer Riley's decision to arrest Nestor for creating an open dump was supported by probable cause. According to his uncontradicted testimony, Officer Riley decided to arrest Nestor - and thus terminated the investigative detention - when he asked dispatch to "just start a CAD for [him]" (Dkt. No. 25-4 at 7). Therefore, the investigative detention must have remained reasonable in scope between 12:31 P.M., when Officer Riley radioed dispatch to advise that he was on the scene, and 12:50 P.M., when backup arrived after Officer Riley had already asked dispatch to start a CAD (Dkt. No. 25-4 at 1, 7).

During the 19-minute investigatory detention, Officer Riley performed a number of tasks expressly approved by the Fourth Circuit, which Officer Riley testified he undertakes during every encounter (Dkt. No. 29 at 49-50). He questioned Nestor and Martin about their activities and decided to ask for identification for the purpose of running their names through the system. Dispatch quickly advised Officer Riley that both of the men were possible subjects of outstanding warrants, at which time he placed them in handcuffs and requested backup. Dispatch subsequently advised that

25

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

there was no outstanding warrant on Martin, and Officer Riley asked "[i]f you can confirm Nestor. And if not, I'm good here" (Dkt. No. 25-4 at 3).

While awaiting further confirmation regarding Nestor's possible warrant,[8] Officer Riley asked the men several questions about the items in the truck and requested permission to search the vehicle. See Hill, 852 F.3d at 382 ("[A]n officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of the traffic stop."). After requesting a canine unit, and being advised by dispatch that it could not confirm whether Nestor had an outstanding warrant, Officer Riley proceeded with the additional investigative technique of checking Nestor's registration. Dispatch confirmed that the truck's license plate actually was associated with another vehicle, at which point Officer Riley decided to place both Nestor and Martin under arrest.

Given this sequence of events, there simply is no evidence that Officer Riley unduly extended Nestor's detention past the time

[8] Nestor makes much of the fact that Officer Riley stated "if not, I'm good here," arguing that he had abandoned the investigation into Nestor's active warrant at this time (Dkt. No. 41 at 7). The plain language of Officer Riley's request, however, indicates that he wanted to know whether or not dispatch could confirm that Nestor was the subject of an outstanding warrant.

26

necessary to investigate the creation of an open dump. At all relevant times, Officer Riley was engaged in permissible incidental investigative techniques, and Nestor certainly has not alleged that Officer Riley conducted the investigation "in a deliberately slow or inefficient manner, in order to expand a criminal investigation within the temporal confines of the stop." Hill, 852 F.3d at 384. Nestor's investigatory detention therefor was reasonable in scope.

**C. Officer Riley's decision to arrest Nestor for creating an open dump was supported by probable cause.**

Magistrate Judge Aloi reasoned that Officer Riley lacked probable cause to arrest Nestor for creating an open dump (Dkt. No. 38 at 8-10). Although neither party objected to this conclusion, after reviewing the record, the Court is compelled to disagree. The totality of the circumstances within Officer Riley's knowledge supported the existence of probable cause to arrest Nestor.

"[A]n arrest based on probable cause serves interests that have long been seen as sufficient to justify the seizure," and officers may make warrantless arrests even for misdemeanors committed in their presence without offending the Constitution. Virginia v. Moore, 553 U.S. 164, 173 (2008). "'Probable cause' sufficient to justify an arrest requires 'facts and circumstances within the officer's knowledge that are sufficient to warrant a

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)). Much like the test for reasonable suspicion, the probable cause analysis looks at the totality of the circumstances. It "does not involve the application of a precise legal formula or test," but gives deference "to the inferences drawn by law enforcement officers on the scene." Id.

Here, when Officer Riley asked dispatch to "start a CAD," signifying that Nestor and Martin were under arrest, the arrest was supported by probable cause to believe that a misdemeanor had been committed in his presence. Indeed, all of the facts that support a finding of reasonable suspicion also support a finding of probable cause. Officer Riley witnessed Nestor unloading "trash" and "junk" from his truck on the side of the road onto private, posted property in a manner inconsistent with a permitted open dump.

Although Nestor initially explained that he and Martin simply were making room to transport portions of a nearby trailer that they intended to tear down with the owner's permission, the incredible nature of Nestor's account quickly became apparent.

28

Nestor provided a landowner's name that was unfamiliar to Officer Riley, who knew the area well due to frequent poaching complaints. Moreover, a local passerby confirmed that the name given was not the true owner of the land. An officer of reasonable caution thus could infer that he had witnessed Nestor creating an open dump, and Officer Riley's arrest therefore was supported by probable cause.

**D. The dog sniff of Nestor's truck was permissible because he had been lawfully arrested, and the truck was not in a constitutionally protected area.**

Rather than transport Nestor from the scene when Deputy Deem arrived at 12:50 P.M., Officer Riley "wait[ed] on the canine unit to get there" (Dkt. No. 29 at 59). Magistrate Judge Aloi reasoned that the officers were free to do so because the unregistered truck was parked on public property and incapable of being driven away (Dtk. No. 38 at 11). Nestor, however, objects that the vehicle was not, in fact, located on public property (Dkt. No. 41 at 9). After careful review, the Court concludes that the officers could conduct a dog sniff of the vehicle following Nestor's arrest, and the truck's location on the edge of private property did not render the dog sniff and subsequent search unreasonable.

A canine sniff is one type of "unrelated investigation[]" that officers may employ while executing a traffic stop or other

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

investigatory detention. See Caballes, 543 U.S. 405. As with similar techniques, however, dog sniffs are only permissible to the extent that they do not affect the scope of the original detention. Id. In Rodriguez v. United States, the Supreme Court recently reaffirmed that an incidental dog sniff is unlawful if the seizure at issue "is prolonged beyond the time reasonably required to complete th[e] mission" of the detention. 135 S. Ct. at 1612 (alteration in original) (quoting Caballes, 543 U.S. at 407).

Courts, however, have recognized that this rule applies only if there is an ongoing seizure capable of being prolonged. For instance, the Sixth Circuit reasoned "that an unoccupied, parked vehicle has not been detained and that the use of a drug dog does not in itself require reasonable suspicion." United States v. Dyson, 639 F.3d 230, 233 (6th Cir. 2011). Because officers may conduct dog sniffs of publicly parked vehicles at will, a lawful arrest may be followed closely by a dog sniff, even if the vehicle's owner was previously the subject of a mere investigatory detention. See, e.g., United States v. Engles, 481 F.3d 1243 (10th Cir. 2007) ("A dog sniff of the exterior of a vehicle parked in a public place does not require reasonable suspicion because it is not a Fourth Amendment intrusion."); United States v. Jones, No.

30

**USA V. NESTOR 1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

16-4158, 2017 WL 5615839, at *1 (7th Cir. Nov. 21, 2017) ("It would be pointless to argue that the police violated the Fourth Amendment, for Jones was under arrest before the canine sniff . . . and the sniff occurred swiftly after his arrest.").

Take for example United States v. Hunnicutt, where the defendant was arrested during a traffic stop for driving on a suspended license. 135 F.3d 1345, 1350 (10th Cir. 1998). Following the defendant's arrest, officers deployed a canine, which uncovered the presence of narcotics. When the defendant challenged the search of his vehicle, the Tenth Circuit reasoned:

> [U]nder the circumstances of this case, no individualized reasonable suspicion of criminal activity was required to call the canine unit. The officers were already justified in impounding the vehicle because no one had indicia of authority to drive it or verification of insurance. [The defendant] was already under lawful arrest for driving under suspension, and the wait for the dog was only fifteen minutes.

Id. (internal citation omitted). Indeed, "detention of a driver at the scene to accomplish a canine sniff is generally reasonable where the driver is already under lawful arrest." Id.

In this case, the undisputed evidence establishes that, by 12:50 P.M., when Deputy Deem arrived to assist with transportation, Nestor had been lawfully arrested for creating an open dump. The officers continued to detain Nestor at the scene, waiting a mere

31

USA V. NESTOR 1:17CR43

MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]

eight minutes more for the canine unit to arrive. Because Nestor was under lawful arrest, no reasonable suspicion was required to conduct a dog sniff, and the eight-minute wait was entirely reasonable. See, e.g., Engles, 481 F.3d at 1245 (25 minutes); Hunnicutt, 135 F.3d at 1350 (15 minutes); Jones, 2017 WL 5615839, at *1 (citing United States v. Fiala, 929 F.2d 285, 288 (7th Cir. 1991) (1.5 hours)).

Nestor argues that his truck was not located on public property, and could not have been subject to a dog sniff by any passing officer (Dkt. No. 41 at 9).[9] Although Officer Riley testified repeatedly that Nestor's vehicle was parked on "private property" (Dkt. No. 29 at 7-8, 41), the location of Nestor's truck did not render the dog sniff unreasonable or otherwise in violation of the Fourth Amendment.

"[N]ot all investigations conducted on private property are subject to the [Fourth] Amendment's protection." United States v. Jackson, 728 F.3d 367, 373 (4th Cir. 2013) (citing Hester v. United

[9] Nestor also objects, without explanation, to Magistrate Judge Aloi's finding that the vehicle "could not be driven away as a result of the invalid registration" (Dkt. No. 41 at 9). Officer Riley testified without contradiction that, under the circumstances presented in this case, he would not have allowed Nestor to arrange for transportation of the vehicle, but rather, even absent the dog sniff, would have called a tow truck(Dkt. No. 29 at 56-57).

32

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

States, 265 U.S. 57 (1924)). Rather, "[t]he Fourth Amendment protects homes and the 'land immediately surrounding and associated' with homes, known as curtilage, from unreasonable government intrusions." Covey v. Assessor of Ohio Cty., 777 F.3d 186, 192 (4th Cir. 2015) (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). This protection prohibits dog sniffs when conducted in a home's curtilage. Florida v. Jardines, 569 U.S. 1 (2013). When a home or its curtilage are not at issue, the "open fields" doctrine "permits police officers to enter and search a field without a warrant." Oliver, 466 U.S. at 173.

"[T]o determine the boundaries of a home's curtilage," and thus whether an area of private property is constitutionally protected, the Supreme Court outlined the following factors:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

Id. (quoting United States v. Dunn, 480 U.S. 294, 301 (1987)). These factors inform analysis of "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. (quoting Dunn, 480 U.S. at 301).

33

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

On the present record, there simply is no indication that the portion of "private property" on which Nestor's truck was situated was located anywhere near a home or curtilage protected by the Fourth Amendment. Rather, by Nestor's own account, he had positioned his truck "on a rural road in West Virginia" (Dkt. No. 41 at 5). The only testimony regarding surrounding structures relates to an old, dilapidated camping trailer - apparently visible from the road - that Nestor initially explained he intended to tear down (Dkt. No. 29 at 9).

Likewise, there is no indication that the landowner was using the area in question for "intimate activities," or had taken "steps to protect his [land] from observation." Vankesteren, 553 F.3d at 290. The mere fact that there were posted signs along the property's edge does not render the property protected under the Fourth Amendment. Id. at 289 (discussing Oliver, where "police walked around a locked gate with a 'No Trespassing' sign," but the Supreme Court upheld the search).

Therefore, after considering the facts of this case and the factors articulated in Dunn, the Court concludes that Nestor's truck was not situated on property protected by the Fourth Amendment. The dog sniff therefore was reasonable. Accord United

34

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

States v. Hayes, 551 F.3d 138, 145 (2d Cir. 2008) ("The sanctuary of the home simply does not extend to the front yard of Hayes's property, where the initial sniff occurred."). Given that Nestor has not challenged its reliability, the positive alert that resulted from the dog sniff gave the officers probable cause to search the vehicle, upon which they uncovered controlled substances and the firearm at issue. See United States v. Christian, 452 F. App'x 283, at *1 (4th Cir. 2011) (unpublished decision) (citing Caballes, 543 U.S. 409-10).

## V. CONCLUSION

In summary, Officer Riley subjected Nestor to a lawful investigatory detention pursuant to Terry v. Ohio, which concluded in an arrest supported by probable cause to believe that Nestor had been creating an open dump. The subsequent dog sniff and search of Nestor's truck likewise were in compliance with the Fourth Amendment. Therefore, for the reasons discussed, the Court:

**1)** **OVERRULES** Nestor's objections (Dkt. No. 41);

**2)** **ADOPTS in part** and **REJECTS in part** the R&R (Dkt. No. 38); and

**3)** **DENIES** Nestor's motion to suppress (Dkt. No. 17).

It is so **ORDERED.**

35

**USA V. NESTOR** **1:17CR43**

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [DKT. NO. 38] AND DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 17]**

The Court **DIRECTS** the Clerk to transmit copies of this Order to counsel of record and all appropriate agencies.

DATED: January 17, 2018.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE

36